Exenet Systems v. Rubenny Okay, once we're settled, we can start. So, Mr. Campanelli, you have reserved three minutes for rebuttal. Yes, Your Honor. That gives you seven minutes to start. Good morning, Your Honors. Thank you, and may it please the Court. My name is Andrew Campanelli. I represent the appellants. Your Honors, as set forth in our briefs, I respectfully submit that the District Court erred and abused their discretion on two specific grounds and request that the decision be overturned. The first error on the part of the District Court is the fact that the District Court refused to recognize the significance and import of potential adverse aesthetic impacts in connection with the appellee's application. Which particular impacts are you talking about? I'm sorry? What particular impacts are you talking about? I'm talking about the adverse aesthetic impact which is inflicted upon a home where one irresponsibly places a low, wireless facility in close proximity to their home. This Court, Anomaly Point 2... Did they move that particular node, the one that was near a daughter's bedroom? No, there were 30 nodes in all. The appellants are only challenging four, and it was based upon the specific location of each node with respect to each respective home. Depending upon the location and distance, the installation of these facilities can have various impacts or various degrees of adverse impacts based upon saying, especially because while they're smaller than your typical cell tower, they tend to be installed at much lower elevations and much closer to one's home. They're typically installed anywhere from 7 to 15 feet off the ground. And if you happen to have a utility pole right in front of your front door, you can imagine the adverse aesthetic impact on your curb appeal as a homeowner But I thought there was a settlement of all the placement nodes that were an issue. Didn't they offer to move any particular node that was offensive? There were negotiations between the village and Extinet. They did speak to one of the appellants, not all of them, and they couldn't come to an agreement for that one appellant. The stipulated facts that are put in the record... No, I have four. There were four homeowners and four nodes. Yes. As Americans, we are obsessed with aesthetics. That's why we spend billions at Home Depot and Lowe's. And unfortunately, if and when you install one of these facilities too close to your home, I've seen them literally on front lawns. I've seen them right in front of front doors or five feet outside a bedroom window. It's not against all cell towers. The appellants are against the irresponsible placement of these four out of the 30 because if experts have determined they will have significant adverse impacts on their home... Well, let's break this down. I mean, it seems to me your principal point was a legal one. Yes. The court relied on a district court case that was subsequently, in your view, overruled effectively, right? Yes. The court's decision is clearly at odds with this court's decision in Omni.2. But why do you say that? I mean, Omni.2 was not an intervention case, right? It's not, but Omni.2 found several things. Number one, it found that denial of a permit based upon adverse aesthetic impacts is a proper grounds for denial of the permit. This court also held, critical import, held that the visual impact analysis, which was provided by the applicant or the applicant in that case, could have been rejected and ignored by the Board of Appeals because that visual impact analysis, in this court's words, did not include any photographs taken from the nearby residents' second story windows, much less their backyards. This court recognized explicitly the import of the dramatic potential adverse aesthetic impact that that facility could have. It recognized the potential for these things. Yes. It said then that the record didn't support it, right? Well, in this case, and bearing in mind that homeowners are hamstrung by the Telecommunications Act because when an application of this type is submitted to a local zoning board, the local government has a 60-day window to make a decision. So if they advertise the public hearing for 30 days and only at that public hearing do the homeowners find out where they're planning to put the towers, the homeowners would then be able to go serve a freedom of information law request to get the files and then try to get an appraisal or something like that. Here they didn't have time. So they did the next best thing. They got experts in the form of real estate brokers. Not just any real estate brokers. Real estate brokers who have an acute understanding of this specific real estate market who've been licensed brokers in Kings Point for up to 30 years. And they gave professional opinions. The first one gave an opinion with 30 years' experience in selling homes with an average price of $3 million. There was evidence that anyone had tried to sell their home and lost value. That was not in the record. Isn't that correct? The letters, the professional opinion letters are in the record. No, I know the letters are. But was it based just on the speculation of the real estate brokers? I respectfully submit that with 30 years' experience, they are experts. And they've given expert testimony across state courts across the country. But did they have anyone who tried to sell their house and alleged that the value was 25% less than it would have been without the nodes? No, they didn't put their homes up for sale yet. No, but the issue is were there other homes with nodes that realized the 30% reduction in value? That's the point, right? The district court said this is just speculative. It's conclusory. And let's be focused on the standard of review here. This is an abuse of discretion is what we're saying. So you're arguing that the district court abused its discretion in its conclusion that the impact of the nodes was not established. At a bare minimum, there should have been a hearing to determine whether or not the adverse aesthetic impact was of sufficient magnitude that it could serve as a protectable property interest. Did you ask for a hearing? We weren't afforded an opportunity to have a hearing. So you did not ask for a hearing? No. So then how could the judge have known? Well, if we were able to intervene, then we could ask for a hearing. But the motion was simply to intervene at this juncture. We're not a party to the action. How can I ask for anything other than to seek to intervene? Okay. But it seemed to me your principal argument was a legal one, as I said. Yes. Which is that Omnipoint 2, the Court of Appeals decision, effectively overruled Omnipoint 1. Yes. You then sort of, in the course of talking about that, then sort of slip in arguments about the broker's letters. But it's not clear to me that that's really the argument that you're making on appeal. They're somewhat inseparably intertwined. Usually, if there's a significant adverse aesthetic impact, that will infect the value of the house. It's a matter of public record for years. Ever since the 5G rollout started especially, people are seeing wireless facilities such as these being installed in much closer proximity to their homes and significant drops in the real estate values as a result. Right. So then it seems to me your argument is that because they had brokers, real estate brokers, who said, yeah, these things make a difference of up to 30% of the value of a home. They weren't generalized letters, Your Honor. They were specific. They said, if this facility goes where it's planned by this house, it's going to reduce the value of this house by this percentage. They were very specific. They were not generalized letters. They didn't say, oh, in my experience, if a cell tower is near your house, it's worth less. No. They gave a professional opinion based upon each specific institution. Usually, if you're here for the last argument, you saw that generally opinions have to be sort of backed up with something before they're going to be entitled to much weight. And so the argument or the conclusion of Judge Matsumoto was that there was nothing other than these conclusory statements. And that's not enough. I would respectfully submit they weren't conclusory statements from a layperson. They were expert statements and that at a minimum, the court should have afforded the appellants the ability to have a hearing or submit supplemental evidence, which they were not afforded time to produce in the underlying proceeding. If I may just have- We're running out of time. But I guess the other point I think that you are arguing on appeal is that the district court erred or abused its discretion with respect to the adequacy of the representation by the village. Yes. If I can go very quickly, Judge, I apologize. Yes. The village has an obligation. Both parties, the appellants and the village, wanted the village's decision upheld. That's true. But their interests diverge, as always, because the village's interest is protecting the village as a whole. And what it ultimately did in this case, as it does in every single case, is it looks at the money. And what routinely happens in this case and the other 11 cases just in the Eastern District that I cited in my brief, it always happens. They deny the application. Extinet or the other site developer comes in, files a lawsuit, and the village says, we can't pay $150,000 to litigate, so we're just going to give them everything. Which is exactly what they did in this case and the other 11 cases cited in my brief. So their interests diverge. They're more worried about protecting their coffers than protecting the individual homeowners who stand to suffer the adverse impacts due to the irresponsible placement of not all these facilities, just these four. When you were introducing that, you said, in this case, as in every case, their interests diverge. And I'm wondering whether that means that the municipality's defense of its denial will never constitute adequate representation vis-a-vis individual homeowners. Something about this case that makes it more exceptional. It's the rule rather than the exception where the village will actually stand up for the individual homeowners. They don't generally have the money or the desire to spend the money to defend these cases. And in shorthand, there's just very recent cases just in the Eastern District. I gave you 11 cases, four from Extinet, four from Crown Castle, two from another, and it's always the same. They properly find a proper ground to deny the application where it should be denied. The site developer files a lawsuit and the municipality caves again and again and again and gives them everything they want. And meanwhile, if you can't get intervention, the homeowner gets no opportunity here to be heard. But the homeowner did have opportunities under village and state law or procedures to object to the entry of the consent in this case, right? That's happened in many cases. It may have happened in many cases, but I'm saying that that was not something that your clients availed themselves of. Well, we weren't a party. We were denied intervention, so how do we have standing to obsess? But the village and the state have procedures that would have allowed you to take steps, right, to stop the village from entering into this consent. There are cases within which homeowners have brought Article 78 proceedings to challenge that. And then what happens is the site developer files a notice of removal. It goes to federal court. The district court judge sets it back, and it turns into a nightmare myriad of multiple lawsuits, which is not in the interest of the judicial economy. I understand when this consent decree is entered on the TCA claim, it essentially preempts whatever state laws there are, whatever proceedings are, whatever rights the parties have. Is there further process in the municipality before that consent decree becomes operative? Or at that point, is it a final determination that the sale is going here, and then Article 78 is the available remedy? It's a final determination. It precludes state court review, and even worse, it's treated as if it's a final judgment on a determination of the facts. And so motions to vacate those consent judgments, even where it's asserted that the municipality exceeded the legal authority in entering it, I'm unaware of a single case anywhere in the United States where anybody won that argument. Well, you've reserved three minutes for rebuttal, Mr. Campanelli. We'll now hear from Mr. Goodhouse. Thank you, Your Honor. Thank you. Thank you. You can raise the lectern if that helps. I'm a little. Oh, okay. Yeah. Didn't have the confidence to just go for it. Good morning. May it please the court, Brendan Goodhouse from Cuddy and Federer for Externet Systems, the plaintiff appellee here. The district court did not abuse its discretion in denying intervention to eight residents comprising of four homes in Kings Point. Counsel, have you been negotiating with these four homes or eight residents? So there's a long history here. This all started pre-pandemic. No, that's- During that- No, are you still negotiating? No, no. You're not going to try and help them? That's already been done. So throughout the multi-year process, and this is in the underlying docket in the record and part of the preliminary injunction motion below, there were a handful, the four appellants here, or four households represented by the appellants here, as well as a handful of other residents who raised specific complaints about, I don't like where this one's being placed, it's too close to my home. Externet met, took the extraordinary step of actually meeting with village officials and with concerned homeowners, and either offered or did make specific changes. Here, of the four homes, three of them were involved in meetings with Externet. Two, one of the nodes was actually changed. The node that you were referencing, the- The one with the bedroom? Yeah, it's not near it. It's 350 feet away, and it's screened by a pretty dense tree. Nevertheless, to try to smooth things over and make the process go better, Externet did come up with a variety of alternatives there, just none ultimately ended up being satisfactory to the family. And this is kind of, that's emblematic of what happened in the entire application process, which is why Mr. Campanelli noted that these applications are supposed to, under federal law, be decided within 60 or 90 days. Right, and this has taken five years. Yes, exactly. I have another question about the homeowners' complaints. Many of them feared, rightly or wrongly, the health effects of 5G radiation. This is a 4G installation, is that correct? That's correct. Could you change it to 5G without notifying anyone? No, because the equipment's different. So, what can happen with these installations, because Externet's a neutral host provider, so this application was for Verizon. So, if AT&T wanted to come in and co-locate their 4G network on there, they could do that simply by basically sticking a radio into the box that's already on the utility pole. Into your node? Yes, but again, that's 4G. If you wanted to upgrade this to 5G, it's different, the equipment's different dimensionally. It would require a new application. It would have to go through the same process. Would the village and the homeowners be notified if you did that? They would have to be. We would have to apply to the village. Tell me under what section of law they'd have to be notified. This is the TCA we're talking about. Not under the TCA, under a local code. So, under local law? Yes, because Externet would have to follow the exact same process it followed for this application. Oh, you'd have to make an application to go from 4G to 5G? Practically, yes. The application wouldn't be to go from 4G to 5G, but it would be to put the necessary equipment up. They would have to file for special permits under King's Point's local code and follow the same process. And all the homeowners would be notified of this? There would be a public hearing, perhaps? Yes. I mean, if history is any suggestion, there would be multiple public hearings. Does Externet have plans to make it 5G? No. So, that's true even if the footprint of the 5G unit is the same as the 4G, that that would require separate permitting? No, because this is where the TCA comes in. And so, if nothing had to be changed, then it would be effectively a co-location, an eligible facilities request under the Spectrum Act. But 5G equipment is just different. It's dimensionally different. It's bigger. The antennas are bigger. The boxes are bigger. So, it wouldn't qualify for that. That's what would trigger the municipal? Exactly. Exactly. Yes. Can I ask? One of the things I'm sort of struggling a little bit with the district court's reasoning, and it strikes me that there's two different claims here for a protectable interest that warrants intervention of right. And one that we've talked about is the impact on property values. And so, the district court makes a determination about how much weight it gives to these expert affidavits, and we have to decide whether that's an abuse of discretion. I want to talk about the other, what I see as the other interest, which is the aesthetic impact in its own right, regardless of whether it impacts property values in a discernible way. I read the district court as suggesting that an aesthetic interest is not protectable as a matter of law. And I read it as citing the OmniPoint One decision for that proposition. And when I go to the OmniPoint One decision, I read it as not supporting that proposition at all. It concludes that the Lulipa claim by the synagogue in that case wasn't cognizable here. All they really are arguing is an aesthetic interest, and that's being adequately protected by the municipality. And so, they didn't say it wasn't a protectable interest. They said it was being adequately protected. So, I'm trying to figure out, it seems like in your briefs you've taken the position that an aesthetic interest as a matter of law is not protectable. I haven't found any cases that support that, and I'm wondering if you could help me out with that. Sure. So, I think what's important in viewing every single aspect of the intervention analysis is you look, and this court's noted it in various contexts, what's important is what's the underlying statutory scheme at issue in the case. Here you have the Telecommunications Act. And in our brief, I think we described it as saying under the Telecommunications Act, certain rights are granted to telecommunications providers or infrastructure providers, and limitations are placed on municipalities. And to be frank, that's somewhat imprecise. The Telecommunications Act is a statute of federal preemption, and it doesn't even really grant companies like ExNet's legal rights. The Supreme Court in Rancho Los Palos Verdes made that clear. There's no private right of action created under the Telecommunications Act. What it does is it gives somebody in ExNet's view the right to seek judicial review when it believes a municipality has exceeded authority that was preempted by the federal government. So, when you talk about in the intervention context, what is the protectable legal right that gives you enough of an interest to become a party, not just to care about the case, but actually to become a party in the case, I don't think there's anything legally or just logically within the scope of the greater statutory scheme that says just because I say I think this thing's going to be ugly, I'm now a party in a case challenging it. The district court, again, because this is also a factual determination where it has abuse of discretion, I think was well within its discretion to discount the broker letters, which is consistent with any court that's been faced with similar letters like that. We're putting that on the side, just on the aesthetics. On the aesthetics point, I don't think it's enough to say I have an aesthetic concern about something going on a utility pole within a couple hundred feet of my house is enough that I have, not standing, standing's the wrong term, that I have a right to be a party. So, I think I'm drawing two things from your answer. One thing that I'm drawing is no, there isn't a case that says that. You've given some cogent reasons for why that should be the law in your view, but there is no case that says that. The second thing I'm gathering is the rationale that you've offered is broader than just applying to aesthetics and would suggest that an individual whose interest, even if there was very compelling evidence, for example, of diminishing property values, on your rationale, that person still wouldn't have a protectable interest. You're arguing that there's no third party standing, or sorry, not standing, protectable interest for intervention under the TCA period. I think that's right. I want to clarify the point about cases, because a lot of times the elements of intervention, when it's analyzed, it's bled together. So, in, for example, Mr. Campanelli and I had an almost identical motion in Lake Success, which magistrate Judge Ornstein denied intervention there. And I think in that case, as well as relying on, I believe we have it cited, it's a southern district case decided by Judge Versetti. There were two in or around 2018. Well, what they said about aesthetics is, I believe it was at best they have an aesthetic interest, but that interest, to the extent it exists, is being protected by the municipal defendant. So, a lot of times when the courts do the analysis, it's not, they'll bleed together, and that's where you get to the adequate representation prong of it and the municipality seeking to simply defend their denial. This isn't a case, in the limited cases where municipal or state government defendants are found to not be adequately representing, there's normally two distinguishing factors. One is the underlying statutory scheme, where a lot of times it's broader, and there is a specific interest that the intervener has that is protected by that statutory scheme. That's completely absent in telecommunications case, Telecommunications Act case here. The other distinguishing factor in those matters will typically be that they're more complex. There's a wide range of outcomes that could come from the case. The recent New York City policing case that this court decided a couple years ago was one where certain injunctive relief was being sought on the way the NYPD would have to respond to riots and such, and there's a really broad range there. Here, the only interest the village has, the village defendant has, is in a ruling that upholds its denial. The court can either, the village is either going to win, and the court's going to find there was no prohibition of evidence, no prohibition of service, and the denial was supported by substantial evidence. You've now moved into adequacy of representation. I did, yes. But I think I want to go back to what Judge Robinson was talking about. The principal legal argument argued by Mr. Campanelli is that the district court erred in relying on Omnipoint 1 for the proposition that aesthetic impact is not a protectable interest. That's a legal question. His argument is that Omnipoint 2 contradicts that, and I think what Judge Robinson is suggesting, or at least the way I understood it, or what jogged in my mind, was do we need clarity? I mean, should there be an opinion by this court that indicates whether aesthetic impact is a protectable interest under Rule 24? Understood, and I'm glad I'm getting a chance to spend time with you. Well, I mean, it's happening a lot. We've got a lot of district court cases where this is happening. On Omnipoint 2, that case simply held that municipal boards reviewing, and that was a tower application case, reviewing a cell tower application can consider evidence of aesthetic impact. I'm prepared to agree with you for today's argument purposes that Omnipoint 2 does not weigh in on whether or not aesthetic impact is a protectable interest under Rule 24. I'm trying to figure out whether that's something we should be doing, and if so, are we looking then to the Telecommunications Act, or are we just looking to Rule 24 and taking it from there? I think you have to look to the Telecommunications Act. It's, like I said earlier, wide preemptory statute that's also setting up on top of that for judicial review, expedited judicial review that is based on the record before the board. Has it been sufficiently briefed here to say that the Telecommunications Act precludes aesthetic impact from being considered as a protectable interest under Rule 24? I don't think this case is the vehicle for that, Your Honor, because the adequacy of representation is so sound, because it's also a case, like I was mentioning, I was starting to get into there, where there's nothing the interveners can add to this case. You have a set administrative record below. There's nothing they can argue that the municipality can't argue. There's no facts that they can provide. They may want to have different litigation strategy and focus on some arguments and others, but this Court's repeatedly held that's not enough to become a party and show inadequate representation. I think you've answered my question. But, I mean, there is a difference, right? We're not now guessing about whether the interests are going to diverge. The only question before the Court in the TCA claim is whether the statutory prerequisites for overriding a municipal judgment, overriding the denial, are present. At the beginning, everybody's got the same interest in fighting. The municipality, for whatever reason, chooses to settle. I don't think there's any argument that the third-party interveners would have the right to sort of pursue some different remedy, but it is interesting, there is a First Circuit case in this scenario that says that the third-party interveners do have a protectable interest in upholding the denial by the municipality and ensuring that their rights under state municipal zoning laws are not taken away by the preemptive effect of the TCA unless the conditions for doing that are proper. In that case, intervention had been granted by the lower court, and it was just based on standing. I understand. More recently, the First Circuit upheld, in the T-Mobile v. Barnstable case in 2020, upheld the denial of a motion to intervene where the would-be interveners raised similar arguments here. Can you touch on that case again? I'm sorry. T-Mobile, I think it's T-Mobile Northeast v. Town of Barnstable. Okay. At the end of the day, in any intervention case, particularly with government entities, the interveners are going to have particularized interests, whereas the government does will naturally have, or the government subdivision will naturally have, a broader view. Interveners are going to have, any constituent is going to be particularly motivated by some specific fact that is more important to them for whatever reason. And in all those cases, they could say, I would take a harder line here. I would not go for this settlement. But if that's enough to become a party in a case, and this court's noted it in other contexts, the adequate representation element is effectively mooted, because you can make that argument in any single case where the government is acting as a party and there are citizens that would like to intervene. All right. Well, thank you very much. We've got our money's worth, and we will now move to Mr. Campanelli for three minutes of rebuttal. Thank you, Ron. With regard to any allegation whatsoever that the Telecommunications Act in some way precludes local governments from considering adverse aesthetic impacts, I don't think that's the question. The question is, at least as I phrased it, is there something about the Telecommunications Act that would preclude an intervener from asserting aesthetic impact as a protectable interest? No. There is nothing. And there's nothing stopping local governments from recognizing that interest. And I would point to Subdivision 332C7A, which preserved to state and local governments the general authority to regulate the siting, placement, construction, and maintenance of wireless facilities, which essentially means they have the same right to treat an application for the installation of a wireless facility in very precisely the same manner they treat any other zoning application. With respect to your question as to whether or not this appellee could change it from 4G to 5G, the answer is yes, and the village would be powerless to stop them, and here's why. He also told me that he would need a permit to do so, which would trigger the whole notice and comment period. Under the Middle Class Tax Relief and Job Creation Act of 2012, there's a provision that essentially says once a wireless facility is built, the owner of that facility can add equipment, add power output, change the frequency, and even increase the height up to an additional 10 feet, and no local government can stop them. The local government can require them to file an application for a permit, but the permit must be granted no matter what. Well, that's pretty troubling, then. The other thing, of course, is the Spectrum Act, which says if it's an eligible facility, once again, they cannot deny any change of the facility. It has to meet the five criteria. It can't be larger than a certain amount, can't destroy any stealth aspect of the facility, but with these two laws, site developers routinely increase the size and height of wireless facilities, and local governments are precluded by federal law from stopping them once the first facility is built. Any questions? No. I thank you very much. All right, thank you both. We will reserve decisions.